Case number 19-11.6, Ammar Al-Baluchi, a.k.a. Al-Baluchi, a pro-OAO and a peace-abiding politician. Ms. Freyhand for the petition, Ms. Karen for the plenum. Ms. Al-Baluchi, a.k.a. Al-Baluchi, a I am a little confused about the relationship between Judge Sullivan's decision. Judge Sullivan, in his decision, did not make a decision that was in line with the standards of review of habeas.  The Federal judge in this district ruled that the government could destroy the site. Why wasn't that the end of the matter? Well, Your Honor, because Judge Sullivan, and the timing of that order is actually interesting, because Judge Sullivan's order was issued on May 7, 2012. On May 5, 2012, Ms. Al-Baluchi and the other four defendants were arraigned in the 9-11 case. And the government knew that Judge Sullivan's order to create a visual representation of Site A and to then destroy the site was not enough for a death penalty case. And there are a number of issues with Judge Sullivan's order. Number one, it talks about the, quote, potential relevance of the site to the habeas petitions of the detainees. Now, that is a very, very different question than whether or not the site constitutes exculpatory evidence in a death penalty case. And so the government came back. Well, can we just pause on this? Relevance is a lower standard. It should be an easier standard than exculpatoriness. He ruled it wasn't necessary to do this. Why didn't you repeal the habeas decision? I understand your argument with respect to Judge Pohl's that you didn't know about it. I think that you did know about Judge Sullivan's opinion. Yes, we did know about Judge Sullivan's opinion. But to be perfectly honest, Your Honor, within three months... I always want you to be perfectly honest. I will endeavor to do so. You're our friends, too, just like in the previous case. Absolutely, absolutely. As I said, this order was issued in May 2012. Within months, within three months of that order being issued by Judge Sullivan, this exact same issue, the preservation of Site A, was being adversarially litigated before the Military Commission on a motion from the government itself. A motion from the government to the Military Commission asking, again, from the Military Commission, permission to go ahead and destroy the site and create some sort of visual mock-up for it. At that point, it seemed prudent. Again, I will be perfectly honest with the Court. Given the lamentably low standards of Guantanamo habeas litigation, it seemed not only reasonable but much more appropriate to litigate that issue in the Military Commission where we can talk about the centrality of that site specifically to Mr. Albulucci's death penalty case. Let me ask just one more question. If you could point me to any place in the classified or unclassified appendix that explains why what remains of the site is exculpatory, not just relevant, not just might be exculpatory, but is actually exculpatory, what page would you tell me to look at? Absolutely, Your Honor. I would say to begin at the classified appendix, page 2460, which is part of our submission to the Court of Military Commission's review. And is this the expert report or is this something else? No, Your Honor. And those are also useful. What's the title of the document? The title of that document is Petitioner's Reply to Government Response to Petitioner's to the Court of Military Commission review. And I would point you to that. And I would point you also, if I may, Judge Garland, to AE 52A, which is, I believe, I think. Say it again. I apologize. Appellate Exhibit 52A, which begins at page 40 of the classified appendix. And in that document, if I may just briefly talk about that, because that 52A was filed in September 2012. It was over seven years ago. Over seven years ago we made the argument that Site A was exculpatory. We knew that Mr. Albulucci had been held there. We knew he'd been held there immediately prior to coming to Guantanamo. My question is, just to sharpen it just a little bit, why it's exculpatory over more exculpatory than the video. The site itself? No, no. Whatever the pages you're pointing to me, which I'll certainly look at, I want to know why they are more exculpatory or a different kind of exculpatory than the video alone. I mean, we are on the question, at least, of whether the video is a sufficient substitution. And to show that it isn't, you'd have to tell us something about why the physical site would be different. Now, one way would be if one of your clients said there's something at the physical site that isn't represented in the video. I didn't see any argument like that at all. If I may, Your Honor. Yes. It is not that our client said that there is something in the physical site that's not represented in the video, but in those 10 pages that I quoted to you, 2469 to 2479 of the classified appendix, we do go into great detail where we have identified explicit errors in that visual substitution. Now I know which one you're talking about, but the errors is not the question I'm asking. I don't know the answer to this question. That's why I'm asking you. Sir? Is there something? I mean, yes, you say there are errors in the video. But the question is, are the errors exculpatory? That is, is what would be there but for the errors exculpatory? And is there a place where you explain actually in this place there is X and it's not shown and X is exculpatory? So we do explain that in those pages, but also I think what we explain in some detail in the CMCR reply is the actual connection of the conditions of confinement at Site A. And just to back up for a second, I'm referring back to 52 alpha, which begins at page 40 of the classified appendix. Which begins at which page? Page 40 of the classified appendix. It's important to remember, and I want to answer your question directly, but it is important to remember, Judge Garland, that the CIA program, the most important part of that program was the psychological torture. It was not the physical torture that Mr. Aboulish endured. I know, again, I understand your argument, but I would have to focus on the only thing that's before us, which is the question of do we issue an order staying the destruction of whatever remains? That's the only question in the end that we have to answer, right? Yes, sir. Okay. So that would require some clear and indisputable reason why the physical site would help you in a way that the video doesn't. And I'm asking you to help me with that question by pointing to something in the record that shows that difference. Absolutely, Your Honor. And I can get you the particular page numbers for this, in case I'm not quoting them correctly. But the point about whatever remains of Site A is to be able to, as any defense counsel would in any scene in which a crime had taken place or any sculptural acts had taken place, be able to gauge the temperature, the smells, the building materials, the use of sound, the ability, the sight lines, the ability to hear other people nearby. And I would point that particular element, Your Honor, These are all psychological factors that were implemented into these purpose-built sites by the CIA for the purpose of maintaining the condition of learned helplessness in the Straub Lucci right before he was re-interrogated by the FBI for statements that they want to use to execute him now. And so I want to focus for a second on the ability to hear other people at the site. And I won't go further than that in an unclassified setting, but I will refer, Your Honor, to 8E114R. And I will find you a page number for that in the classified appendix where Mr. Alba Lucci discusses that particular element. Okay. Thank you for the questions. Thank you. Thank you, Your Honor. May it please the Court. If I may begin with Judge Sullivan's decision. Judge Sullivan authorized the government to substitute preservation in situ for this digital and photographic representation on the ground that it was sufficient not only to preserve evidence in the habeas case, but also in the military commission case. And he explained that that evidence was relevant in the habeas case for the same reason that's relevant in the military commission case, which is not because it's exculpatory, but because it can be used to enable the petitioner to challenge the statements that he made during his conditions of confinement as being involuntary and thus unreliable. And Judge Sullivan authorized the government to do so on the ground that this method of preserving evidence through a digital and photographic representation was sufficient. And he did so without even viewing Site A. Now, Judge Pohl went further than that, and he required the government, before he would authorize the government to substitute preservation methods and dismantle Site A to provide to him the final proposed digital and photographic representation. And he explained during Fort Dyer to all the parties that this was a two-year process and that during this two-year process, he required the government to make additions to the representation, including by, for example, adding cameras, so that the representation would capture even more detail. But I think the question that's presented here is not, is it clear and indisputable that the representation is an adequate substitute, because Petitioner has said in his reply on page 6 that he's not asking the court to rule on that, but it is instead an anticipation of that potential review if the military judge denies Petitioner the relief that he requests, for example, suppressing statements that he made during his detention. Is it clear and indisputable that Petitioner is entitled to indefinite physical preservation of the site in order to conduct that review? And in the government's view, the answer to that question is no, because the record regarding Petitioner's conditions of confinement is preserved for appellate review, and that record includes detailed accounts of the periods during which Petitioner was subjected to enhanced interrogation techniques, and Petitioner was not subjected to enhanced interrogation techniques at Site A. The government has acknowledged in the military commission case that he was subjected to enhanced interrogation techniques, but not at Site A. The record will also include... Do we have to make a decision about that question? No, Your Honor, but I offer that in case this court wants to consider what's at stake. And then the record also includes reports, photographs, and witness statements of Petitioner's conditions of confinement at CIA detention sites, medical, physical, and psychological assessments generated during his detention, summaries of all the statements that he made during his detention, CIA personnel who had direct and substantial contact with the accused, and it includes any results of investigations conducted in response to allegations about the CIA's former rendition detention and interrogation program.  And Petitioner asked the question, how could Judge Pohl have authorized the government to substitute these preservation methods without actually viewing Site A? But Judge Pohl reasonably relied on declarations from the FBI in Appellate Exhibit 52W, and the FBI attested to the accuracy of the representation, and they discussed in detail all of the data that they collected, including 7,000 data points, 2,500 photographs, 465 laser scans, 100 drawings based on GPS data, manual measurements and blueprints, and five video segments. And that data has been preserved by the FBI and can be made available to this court for its review. So Judge Pohl, as I said, actually required the government to produce to him this final digital and photographic representation before he authorized it. Judge Sullivan authorized the government to do so just based on the principle that this type of method of preservation was consistent with well-established standards of evidence preservation. What do you say to your opposing counsel's argument that those captures do not adequately represent the sound, smell, atmosphere that might be relevant with respect to enhanced interrogation? In rejecting that argument, Judge Pohl explained in Appellate Exhibit 425PP that Petitioner has available to him comparable evidence in the form of, for example, witness testimony. And he said that Petitioner will have the opportunity to examine, either through direct or cross-examination, witnesses who view the physical evidence at Site A, and that Petitioner himself can testify about the sounds that he heard or the smells that he smelled. And the government has said, regardless of whether Petitioner testifies, the government is going to stipulate to Petitioner's conditions of confinement in the military commission. So the government may even be willing to stipulate that the Petitioner heard a particular sound or that he smelled a particular smell, and even that the walls and the cells at CIA detention sites were made of a particular matter. Petitioner also has available to him expert witness testimony, and those expert witnesses can use the information that Petitioner does have, which includes drawings, measurements, still photographs, and videos, to make reasonable inferences about what this additional information would have shown. Unless the Court has any other questions? Thank you. Is there time left? We'll give you one more minute if you want. Thank you very much, Your Honor. I just want to briefly address my friend's point about comparable evidence. Everybody is friends here. This is great. We try very hard. We spend a lot of time together at Guantanamo. My friend's argument regarding comparable evidence, which, of course, is one of the truncated factors, and Judge Pohl relied on that in 425 double papa. The first point I want to make is that Judge Pohl, and I will refer you to the briefs on this, was under a conflict of interest when he issued 425 double papa. Was under what? A conflict of interest, Your Honor. But he referred to three areas of comparable evidence. The first was witnesses, witnesses about what happened at site A. The conflict of interest is the one that was resolved in this Court at that time? No, Your Honor. That was a different case. It was a different military judge at Guantanamo. Unfortunately, we had the same issue with ours. Okay. Similar issue with ours. But the first issue, excuse me, the first example of comparable evidence he mentioned was witnesses. And I'd like to point out that the government has actually refused us access to every CIA official that we have requested as witness thus far. He also pointed to the availability of our client. And we have a copious amount of information in the record, including the declarations that Judge Garland referred to, from psychologists, from experts, talking about how when someone is subjected to torture, their memory is fragmented. The memory of Mr. Albulucci is not reliable. We cannot rely on it for his death penalty case as a source of comparable evidence for exculpatory evidence here. And the third is the issue of substitutions. And my friend had an impressive number of pages and records, which, unfortunately, I've heard before. And there are two points to make on that. Number one, recently Judge Acosta, in the newly restarted Mishiri case, refused to reauthorize, reapprove thousands of government substitutions using exactly the same method that we use in the 9-11 case, precisely because he found that the government was relying on declarations that were overbroad and were out of date. And that is exactly what we have been arguing with regards to those thousands and thousands of pages that they have produced to us for over now nearly eight years of pretrial hearings, that those substitutions are not adequate substitutions, that we know that there is underlying information that is being redacted for the government's benefit. And we have argued that before the Military Commission on the basis of, for example, documents that have been issued via FOIA that are less redacted than the documents that we receive at the Military Commission. And so Your Honor should be aware that when we talk about comparable evidence at the Military Commission, we submit that there is none for this site. All right. Thank you. Are there questions for the panel? No. Thank you all, both sides. We appreciate it. We'll take the matter under submission.
judges: Garland, Tatel, Edwards